**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHERYL C. SHIVELY,                                    Case No. 1:13-cv-788

                    Plaintiff,                                    Spiegel, J.
          v.                                                        Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.


**REPORT AND RECOMMENDATION**

Plaintiff Cheryl Shively filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents five claims of error. The Commissioner filed a response, to which Plaintiff filed a reply. For the following reasons, the undersigned recommends that the ALJ's finding be REVERSED, and remanded for an award of DIB benefits to begin on August 1, 2009, or alternatively, for an award on a date to be determined not later than August 4, 2010.

**I. Summary of Administrative Record**

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on December 21, 2007. She later filed an application for supplemental security income ("SSI") on March 5, 2008. Both applications alleged a disability onset date of March 16, 2007 based primarily on multiple physical conditions. Plaintiff's last insured date for purposes of DIB is December 31, 2012.

After Plaintiff's applications and subsequent requests for reconsideration were denied, she timely requested an evidentiary hearing. Administrative Law Judge ("ALJ") Deborah Smith held a hearing in Cincinnati, Ohio. ALJ Smith issued an adverse written

decision on August 3, 2010.  However, the Appeals Council granted Plaintiff's request for further review, vacated the ALJ's decision, and remanded for further consideration.

While her first claim was still before the Appeals Council, in October 2010, Plaintiff filed a second application for benefits, also alleging disability since March 2007. Although initially denied in March 2011 (Tr. 308), Plaintiff's application was granted on reconsideration in April 2011. (Tr. 375).  The reconsideration determination found Plaintiff to be disabled and eligible for DIB as of August 4, 2010, the day following the ALJ's first decision, which was then still on appeal.  The award of benefits on Plaintiff's second application was based on the determination that Plaintiff's sedentary RFC with additional non-exertional mental limitations precluded her from performing her prior relevant work, and that she therefore was presumptively disabled based on her advanced age and RFC under Grid Rule 201.  (Tr. 356).  Plaintiff filed an appeal to the Appeals Council, arguing that an earlier onset date should apply.  When the Appeals Council subsequently remanded the August 3, 2010 decision to ALJ Smith in October 2011, the Council held that the two applications were duplicative.  Therefore, the Appeals Council also remanded Plaintiff's appeal of the onset date in her second application, instructing the ALJ to consider both claims in a consolidated proceeding.

The remand order of the Appeals Council found fault with the ALJ's failure in her August 3, 2010 decision to include a "function-by-function assessment" of Plaintiff's RFC, given various physical findings by treating physicians including a limited range of motion in her shoulders, spine, and lower extremities, pain noted by physical therapists, as well as limited weight-bearing tolerance and limited strength, and reported use of a cane, all of which "seem indicative of non-exertional limitations."  (Tr. 377).  The

Appeals Council also vacated the ALJ's conclusion that Plaintiff's complaints were only "partially credible" because the ALJ failed to consider all relevant factors under SSR 96-7p, including

> the location, duration, frequency and intensity of pain or other symptoms; precipitating and aggravating factors; and prior work record. Additionally, the objective medical evidence shows that the claimant has been diagnosed with several medical conditions, which could reasonably be expected to cause the symptoms she complains of.

(Tr. 377-378). The third basis for the remand by the Appeals Council was the ALJ's error in citing to exhibits and/or pages that "do not match up to the exhibits contained in the record." (Tr. 378). On remand, the ALJ was directed to "evaluate the treating source opinions" pursuant to the regulatory framework and "explain the weight given to such opinion evidence," and "[a]s appropriate,…request the treating sources to provide additional evidence and/or further clarification." (Tr. 378). The ALJ also was directed to re-evaluate Plaintiff's subjective complaints and "[i]f warranted … obtain supplemental evidence from a vocational expert…." (Tr. 378).

In accordance with the remand order, ALJ Smith held a second hearing on February 28, 2012. On March 19, 2012, the ALJ issued a second unfavorable written decision, again concluding that Plaintiff was not disabled from her alleged onset date in 2007 through the date of the 2012 decision. Based upon that determination, the ALJ reversed the award of benefits that Plaintiff had received after filing a second application. Thus, Plaintiff was required to repay the DIB benefits that had been awarded under Grid Rule 201.06. Plaintiff again appealed to the Appeals Council, but was denied further review on September 3, 2013.

3

Plaintiff was born in January 1953.  She was 54 years old on her alleged onset date in 2007, but was well into the "advanced age" category (ages 55-59) by the time of the ALJ's first decision in 2010.  She remained barely within that category, at age 59, at the time of ALJ's last decision in 2012.

In her 2012 post-remand decision, the ALJ determined that Plaintiff has the following severe impairments:  "degenerative changes and stenosis of the lumbar spine; arthritis of the cervical spine; osteoarthritis of the knees; osteoarthritis of the shoulder; obesity; and depression and anxiety (only severe since October of 2010)."  (Tr. 163).[1] In addition, the ALJ found that Plaintiff had "intermittent" and "well controlled" Meniere's disease and irritable bowel syndrome, which she determined were non-severe impairments.  (Tr. 164).  As she did in 2010, the ALJ also found that Plaintiff's asserted fibromyalgia was non-severe, because "in order to make this diagnosis, an individual must have eleven out of eighteen positive tender points in specific locations on the body," and "[w]hile the record shows multiple tender points, they are not specifically identified."  (Tr. 164).[2]

The ALJ next held that Plaintiff does not have an impairment or combination of impairments that would meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appx. 1.  (Tr. 165).  Instead, as in 2010, the ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform a range of sedentary

---

[1]The ALJ found the same severe impairments, with the exception of the depression and anxiety, in her August 3, 2010 decision.  (Tr. 294).

[2]The ALJ's 2012 analysis of Plaintiff's fibromyalgia, Meniere's and irritable bowel syndrome mirrored her 2010 analysis of the same conditions.  (Tr. 294-296).

work. Although in 2010 the ALJ did not include additional restrictions, in her 2012 opinion the ALJ included the following additional restrictions:

> [T]he claimant has limited pushing and/or pulling ability in her left lower extremity. Further, she could occasionally climb ramps or stairs, balance, stoop, kneel and crouch; however, she should never climb ladders, ropes, or scaffolds or crawl. Additionally, the claimant should also avoid all exposure to hazards, such as heights or dangerous machinery. Finally, as a result of reduced stress tolerance, the claimant could adapt to work settings in which duties are routine and predictable.

(Tr. 167).

In both her 2010 and 2012 decisions, the ALJ determined that Plaintiff remained capable of performing her past relevant work as an account assistant and accounts payable clerk, which were semi-skilled or skilled positions. (Tr. 174). Based on that conclusion, which was contrary to the agency's April 2011 decision, the ALJ held that Plaintiff was not disabled. (Tr. 175).

Plaintiff asserts five errors: (1) the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain; (2) the ALJ failed to properly evaluate Plaintiff's obesity; (3) the ALJ failed to obtain additional medical evidence as suggested by the Appeals Council; (4) the ALJ failed to properly evaluate Plaintiff's RFC; and (5) the ALJ erred in finding fibromyalgia and irritable bowel syndrome to be non-severe. For the reasons discussed, the undersigned agrees that reversal is required.

### II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to

5

prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of

6

Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B. Specific Errors

For the convenience of the Court, the undersigned will discuss the five asserted errors in a different order than presented by Plaintiff.

### 1. Failure to find Severe Impairments at Step 2

Plaintiff asserts that the ALJ erred by failing to find her fibromyalgia and irritable bowel syndrome to be "severe" conditions at Step 2 of the sequential analysis. In the Sixth Circuit, an ALJ's failure to list additional impairments as severe at Step 2 generally will not provide a basis for reversing the Commissioner's decision. *See Maziarz v. Secretary of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987); *see also Fisk v. Astrue*, 253 Fed.Appx. 580, 583 (6th Cir.2007) ( "[W]hen an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does not constitute reversible error."). However, the record presented illustrates the relatively unusual case in which multiple errors flowed from the ALJ's erroneous determination at Step 2 that Plaintiff's fibromyalgia was non-severe, including a failure to obtain additional medical evidence, a

failure to properly evaluate her subjective complaints of pain, and a failure to properly evaluate her RFC. Those additional errors require reversal.

Plaintiff testified that she was originally diagnosed with fibromyalgia in 1998, although the record reflects that she continued full-time work until March 2007. Perhaps understandably in light of the age of the original diagnosis, Plaintiff's records from her original fibromyalgia diagnosis, while consistent, are not extensive. However, it is clear from the undersigned's review of both the 2010 and 2012 hearing transcripts that the ALJ was extremely skeptical – if not openly hostile - to that diagnosis, which she described as "a diagnosis by exclusion whereby somebody has to go through all kind of different tests, and it has to be excluded after extensive testing. And she's had some orthopedic testing, and she's had some orthopedic reasons for her complaints which could be the basis of her complaints." (Tr. 203-204, emphasis added). The ALJ instructed Plaintiff's counsel "to show me where does she consistently been diagnosed [sic] with fibromyalgia, other than doctors saying that she has, by internal medicine doctors." (Tr. 206). The ALJ ultimately disregarded Plaintiff's diagnosis of fibromyalgia, based on the ALJ's belief that sufficient testing had not been performed to rule out all other possible diagnoses, as well as an additional belief that Plaintiff was required to show that she had "eleven out of eighteen positive tender points in specific locations on the body." (Tr. 164, emphasis added).

As the Defendant concedes, Social Security Ruling 12-2P, published shortly *after* the ALJ's 2012 opinion, clarifies that a specific number and location of tender points is not required to support a diagnosis of fibromyalgia. (Doc. 12 at 3, n. 1). Defendant argues that any error was harmless, because SSR 12.02P still requires the exclusion of

other explanations to validate a fibromyalgia diagnosis based on widespread pain. Contrary to the ALJ's steadfast belief that other possible diagnoses had not been considered, however, Plaintiff testified at the 2010 hearing that she had been referred to a rheumatologist, Dr. Avis Ware, in 1998 in order to evaluate "the possibility of rheumatoid arthritis." (Tr. 204). Plaintiff testified that she was referred to Dr. Ware by an orthopedist who had already determined that she had more than 11 trigger points. Dr. Ware also diagnosed her with fibromyalgia, as opposed to RA. (Tr. 206-207). Dr. Ware's April 17, 1998 report to Plaintiff's treating physician at the time describes "multiple classic tender points [of fibromyalgia] on examination." (Tr. 937). Plaintiff's primary care physician, Dr. Jarrett, made the same diagnosis. (Tr. 207). Like Dr. Ware, Dr. Jarrett made his diagnosis in part on the basis of trigger points, although his records fail to specify the number or precise locations. Plaintiff additionally has been referred to and examined by orthopedic specialists, a pain doctor, and at least one psychologist. (*See* Tr. 265, testimony regarding mental health treatment).

Despite acknowledging that a precise number and a fixed location of trigger points is not required under SSR 12-2P, Defendant argues that the ALJ's rejection of Plaintiff's fibromyalgia diagnosis should be upheld because no physician documented precisely how many trigger points and where each was located, and/or because Dr. Jarrett did not "thoroughly" eliminate all other possible explanations for Plaintiff's complaints. (Doc. 12 at 3). In support, Defendant cites *Perkins v. Com'r of Soc. Sec.*, 2014 WL 619393, at *8 (S.D. Ohio, Feb. 18, 2014)(R&R adopted on May 8, 2014 at 2014 WL 1872119).

*Perkins* is easily distinguishable. There, a single physician repeatedly stated, without any documentation of the basis for his opinion (or corroborating records from any other source), that Plaintiff suffered from fibromyalgia. The ALJ's rejection of that diagnosis was clearly supported by the record given that the diagnosis "appear[ed] to exist in a vacuum," with "no evidence" that the physician in question or anyone else "engaged in any testing whatsoever…, let alone testing specific focal points for tenderness." *Perkins v. Com'r of Soc. Sec.*, No. 1:13-CV-102, 2014 WL 619393, at *8 (S.D. Ohio Feb. 18, 2014), *report and recommendation adopted,* No. 1:13-CV-00102, 2014 WL 1872119 (S.D. Ohio May 8, 2014). "Rather, Dr. Todd seems to have labeled plaintiff's subjective allegations of pain as "fibromyalgia" for lack of a better term." *Id.* In *Perkins*, multiple other sources had suggested that the plaintiff's subjective complaints of pain were very unusual, and likely due to psychological or other causes. Thus, it was not merely the lone physician's failure to clinically assess other possible diagnoses in *Perkins*, but multiple problems with his diagnosis, that provided substantial evidence to support the ALJ's rejection of an isolated diagnosis. "The absence of any evidence supporting Dr. Todd's diagnosis of fibromyalgia, aside from plaintiff's subjective reports, substantially supports the ALJ's determination that plaintiff does not have the medically determinable impairment of fibromyalgia." *Perkins*, 2014 WL 619393, at *9.

The record presented in the instant case is markedly different. The ALJ was highly dismissive of the diagnosis by internal medical doctors and Defendant asserts that none of Plaintiff's doctors "referred Plaintiff to a fibromyalgia specialist," (Doc. 12 at 4, citing Tr. 1650). However, there is no such thing as a "fibromyalgia specialist" other than, perhaps, a rheumatologist like Dr. Ware to whom Plaintiff was referred, and who

confirmed the diagnosis after ruling out other possible explanations for Plaintiff's complaints.[3] The diagnosis was consistently confirmed and/or reiterated throughout all of Plaintiff's extensive medical records, and Plaintiff testified that both an orthopedist and a family physician independently made the same diagnosis based on trigger point testing. Plaintiff also has been prescribed medications approved by the FDA for fibromyalgia, such as Lyrica and Cymbalta, as well as multiple other pain medications. (See Tr. 12 and http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm107802.htm, accessed on December 12, 2014). The ALJ inexplicably was unwilling to accept the consistency of the records of the many providers that treated Plaintiff over the years (including a rheumatologist, orthopedist, internal medical doctors, pain specialist,[4] psychologist, psychiatrist, and chiropractor). (*See generally* Doc. 9 at 26-27, noting multiple references).

Rather than accepting the nearly overwhelming evidence, the ALJ stated: "Evidently, the claimant has related this fibromyalgia diagnosis to her doctors who have simply accepted it, even though the claimant has other orthopedic problems that could account for some of her pain and limitations. She simply does not have all the classic signs and symptoms of fibromyalgia required…." (Tr. 165). The ALJ's criticism of Plaintiff's report of her medical history to new physicians, and the ALJ's belief that each and every one of those physicians "simply accepted" what the ALJ herself believed to

---

[3]There is no specialty devoted to fibromyalgia. According to the National Institutes of Health, fibromyalgia is typically treated by "family physicians, general internists, or rheumatologists." http://www.niams.nih.gov/Health_Info/Fibromyalgia (dated July 2014, accessed 12/12/14).

[4]The ALJ states that Dr. Khan "does not even mention the diagnosis of fibromyalgia in his reports (13F)." (Tr. 165, 296). That statement reflects error. Dr. Khan repeatedly states: "Patient presents with a chief complaint of neck pain radiating into lower extremities since 1968 due to Fibromyalgia and Degenerative Disc Disease." (Tr. 869, 872, 875).

be an erroneous diagnosis, borders on "playing doctor." The ALJ's insistence on her own definition of qualifying "signs and symptoms," including 11 of 18 "specifically" identified tender points in "specific" locations, adds to the conclusion that reversible error occurred.

The ALJ also criticized the failure of Plaintiff to be "seen and evaluated by a neurologist, cardiologist or psychiatrist/psychologist." (Tr. 295). However, Plaintiff was seen and evaluated by a psychiatrist/psychologist. It is unclear why the ALJ believed that in order to accept the diagnosis of fibromyalgia, Plaintiff also needed to be evaluated by a neurologist and cardiologist;[5] there is no record that Plaintiff's pain complaints related to any neurological or cardiac symptoms.

Thus, in contrast to the lone physician in *Perkins* who diagnosed fibromyalgia based solely on the plaintiff's subjective complaints and without any evidence of trigger points, in this case the record reflects that Plaintiff has been to multiple specialists in order to rule out and/or discover other possible bases for her pain. Notwithstanding Defendant's carefully qualified argument that Dr. Jarrett did not "thoroughly" rule out other possible diagnoses, Plaintiff testified that Dr. Jarrett was the third treating physician (after Dr. Ware and an orthopedist) to make the same diagnosis based on trigger point testing. (*See, e.g.*, Tr. 968, assessment of fibromyalgia with increase in back pain, and "quite a bit of tenderness").

Apart from the clear error in the ALJ's failure to find Plaintiff's fibromyalgia to be a "severe" impairment, the undersigned finds no similar error in the ALJ's failure to find

---

[5]While unrelated to fibromyalgia complaints, Plaintiff testified at the 2012 hearing that she had begun seeing a cardiologist, Dr. Behrens, due to high blood pressure (Tr. 256).

Meniere's disease or IBS to be "severe."  As the Defendant points out, the evidence of Plaintiff's IBS was sporadic at best, and does not show that the IBS caused symptoms that significantly limited her ability to perform work for at least 12 continuous months.

### 2.  Failure to Properly Evaluate Subjective Complaints

As stated, the mere failure to include a severe impairment like fibromyalgia at Step 2 usually will not require reversal, so long as the ALJ proceeded through the remaining sequential steps.  However, in this case the error greatly impacted the ALJ's analysis of Plaintiff's pain complaints, which are at the heart of her disability claim.  As set forth above in the review of the administrative record, the Appeals Council vacated the ALJ's conclusion that Plaintiff's complaints were only "partially credible" because the ALJ initially failed to consider relevant factors under SSR 96-7p, including

> the location, duration, frequency and intensity of pain or other symptoms; precipitating and aggravating factors; and prior work record.  Additionally, the objective medical evidence shows that the claimant has been diagnosed with several medical conditions, which could reasonably be expected to cause the symptoms she complains of.

(Tr. 377-378).  The other basis for remand was closely related – the reconsideration of Plaintiff's RFC in light of "various physical findings by treating physicians including limited range of motion in her shoulders, spine, and lower extremities, pain noted by physical therapists, as well as limited weight-bearing tolerance and limited strength, and reported use of a cane, all of which "seem indicative of non-exertional limitations."  (Tr. 377).

As the Defendant acknowledges, "the extent to which fibromyalgia limits a person ultimately hinges on the credibility of the person's complaints."  (Doc. 12 at 5).  *See generally Rogers v. Com'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007).  The record

reflects that although Plaintiff was first diagnosed with fibromyalgia in 1998, she continued working for more than nine years after her diagnosis. Defendant argues that the ALJ "reasonably impeached" Plaintiff's subjective complaints. The undersigned disagrees, in part because the ALJ's hostility to Plaintiff's fibromyalgia diagnosis appears to have strongly colored her subsequent adverse interpretation of Plaintiff's subjective complaints.

It is ironic that the ALJ discounted Plaintiff's subjective pain complaints partly because she found that Plaintiff's spine conditions, including mild spinal stenosis and advanced degenerative disc disease and spondylosis, as well as her osteoarthritis in the knees and shoulder, could account for only "some" of Plaintiff's symptoms, but did not fully account for the "intensity, persistence, and limiting effects" of her alleged symptoms. (Tr. 164, 168). The ALJ also was critical of what she perceived as a lack of recommended "aggressive treatment, such as surgical intervention," for Plaintiff's impairments. (Tr. 171). It is unclear what "aggressive" treatment that Plaintiff did not attempt other than surgery, considering she tried injections, physical therapy, chiropractor treatment, a multitude of pain medications, and referrals to specialists. Had the ALJ properly considered the additional impairment of "severe" fibromyalgia (for which surgery is not a recommended treatment option), it is likely that she would have concluded that Plaintiff's pain complaints were more consistent with her diagnoses.[6]

Plaintiff asserts widespread pain complaints that varied in intensity over time, but that ultimately precluded her ability to maintain full-time employment. The Appeals

---

[6]Plaintiff argues that subjective complaints "must be given full credit…unless there is no underlying basis for the claimant's pain." Plaintiff's sweeping statement is not supported either by the case cited, *Floyd v. Finch*, 441 F.2d 73 (6th Cir. 1971), or by other controlling Sixth Circuit case law.

Council pointedly directed the ALJ to reconsider those complaints on remand, including but not limited to Plaintiff's prior work record.   Rather than crediting Plaintiff's perseverance in continuing to work full-time despite the impact of her growing list of ailments and worsening symptoms, the ALJ held her work record against her.  The ALJ noted that Plaintiff alleges that she suffers from disabling neck pain, but noted that "she has worked with the alleged pain since 1968" or for "almost forty years with her allegedly disabling impairment."  (Tr. 170-171).

While a few records refer to neck pain beginning in 1968, the ALJ's statement misrepresents the record.  There is no evidence that the neck pain that Plaintiff later claimed to be disabling was the same pain or as severe when she was a young teen (she was 15 in 1968), nor is there evidence she was then working fulltime.  The ALJ also noted that Plaintiff "alleged that her conditions first interfered with her ability to work on June 1, 2002" but that she did not stop working until 2007, at age 54.  (Tr. 171).  It is difficult to understand why the ALJ interpreted this evidence as adverse to Plaintiff's claim rather than supportive of it, as this fact and other evidence suggested that Plaintiff continued to work, despite increased discomfort and new diagnoses, for as long as she was able.  (*See* Tr. 272).

Plaintiff's medical records reflect not only long-standing and consistent pain complaints, but evidence of an increase in frequency and intensity over time, as she persisted in seeking pain relief.  Plaintiff sought changes in and increases in medication, tried physical therapy, a tens unit, and referrals to a chiropractor and specialists (including a pain specialist) in an effort to obtain relief.  The ALJ focused on documents that showed more "sporadic" treatment and "significant gaps" in treatment for pain

complaints between her alleged onset date of March 2007 and August of 2009, as well as relatively benign findings by examining consultant Dr. Jennifer Bailey during a May 2008 examination. (Tr. 169-170). To be fair, the ALJ's analysis of the medical records for this period of time is supported by substantial evidence, even after reconsidering the same evidence in light of Plaintiff's fibromyalgia diagnosis. However, the record also reflects that Plaintiff persevered in seeking further treatment as more time elapsed. In 2009 she was referred for imaging studies, and was prescribed home health care in August 2009 based on her significant symptoms.[7] She also was referred to a pain specialist in December 2009. Thus, by August 2009, she was clearly experiencing an increase in serious symptoms.

The ALJ found that Plaintiff's past relevant work "was performed at a sedentary level of exertion without evidence of any accommodations," (Tr. 171) but that is another overstatement. Plaintiff testified that she was repeatedly "in and out of work" because of her various illnesses. (Tr. 210-211). She testified that she was "struggling" with continuing to work and was fired in part due to her excessive absenteeism and cognitive confusion she attributed to pain and/or "fibro-fog," but that she was subsequently re-hired. (Tr. 266-267). She explained that her employer twice re-hired her and provided accommodations in the form of "extra help, which helped for a short time" and that her long-time employer also was willing to work with her frequent absenteeism for a time, while she trained her replacement. (Tr. 269-271). However, she explained that she ultimately could not sustain full-time work in March of 2007 due to her health conditions.

---

[7]Although the ALJ acknowledged this fact during the hearing, she mistakenly stated in her opinion that Plaintiff did not begin receiving such assistance until "late 2010." (Tr. 170; *contrast* Tr. 261, 911).

(*See* Tr. 215-216, 272-273, testimony that her pain level and severe fatigue increased over time).

The ALJ also found Plaintiff's daily activities to be incompatible with her pain complaints, focusing on her "babysitting grandchildren for several days a week from 8:30 a.m. to 6:00 p.m., which is inconsistent with her complaints of severe and disabling pain from fibromyalgia." (Tr. 165). However, the record reflects that Plaintiff attempted to babysit her grandchildren only two days per week for a few months in 2008. She testified that the hours were "9:00 to 5:00 some days" but that "sometimes it was half days." (Tr. 193). She testified that the attempt to babysit lasted only "a little while" and there is no evidence that the attempt lasted more than six months. (*Id.*).

The ALJ was especially critical of Plaintiff's testimony in May of 2010 that she had not been on any "long trips" since her alleged onset date in March of 2007. However, a medical record referenced a trip to Washington, D.C. three years earlier, in May 2007. The ALJ pointed to another record that referenced Plaintiff walking her dog, and the undersigned reviewed a third record that referenced an injury that occurred after Plaintiff chased a goat. Such evidence supports the ALJ's determination that Plaintiff's complaints of disabling symptoms for the entire period since March 2007 were not fully credible. On the other hand, the prescription for home health care in August 2009 to assist Plaintiff with activities of daily living, including bathing and basic household chores, together with the medical records as a whole, provide strong evidence of symptoms of a disabling severity beginning in August 2009. (*See* Tr. 261, 911). Plaintiff no longer goes to the grocery store, requiring assistance from the same home health aids. (Tr. 262).

In her appeal to this Court, Plaintiff repeatedly cites December 2012 records from the Home Health Care agency that reflect that Plaintiff is house-bound, requires a cane and a tens unit and daily home health care, with "ongoing" monitoring. The records also note that she wears a hearing aid, and experiences constant pain that interferes with daily living and mobility (limited to twenty feet). Plaintiff submitted this evidence after the ALJ rendered her 2012 decision. However, the Appeals Council denied Plaintiff's request for review after determining that the evidence submitted was not "new and material." (Tr. 1). Therefore, this Court may not consider it in determining whether the ALJ's 2012 decision was supported by substantial evidence. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).

### 3. Failure to Properly Evaluate Plaintiff's Obesity

Plaintiff is obese, at 5' 4" and 225 pounds. (Tr. 163). Social Security regulations do not permit a finding of disability based upon obesity, for obvious reasons. According to the Centers for Disease Control and Prevention, more than one-third of all adults in the United States (34.9%) are obese, the vast majority of whom are not disabled. *See* http://www.cdc.gov/obesity/data/adult.html (accessed on December 1, 2014). Nevertheless, "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments." SSR 02-1p.[8] Fibromyalgia and degenerative disc disease are both musculoskeletal impairments.

---

[8]Plaintiff incorrectly cites to (superseded) SSR 00-3p, but SSR 02-1p incorporates that prior ruling.

SSR 02-1p requires consideration of a claimant's obesity in the assessment of whether a claimant meets or equals any particular listing at Step 3, as well as in the assessment of an individual's residual functional capacity. Here, rather than arguing that she would have met or equaled any particular listing at Step 3, Plaintiff argues that the ALJ's failure to fully consider her obesity adversely affected the RFC determination.

The undersigned finds no error. Plaintiff asserts that "[t]he claimant is clearly limited to walking twenty steps," that her "ambulation is dependent upon the use of an assistive device," and that her "knee, lumbar and cervical issues, shoulder, grasping and reaching abilities and fatigue issues are all complicated by her obesity." (Doc. 9 at 17). However, no citations to the record are provided for these assertions.[9]

The ALJ expressly considered Plaintiff's obesity in two areas of her opinion. First, after noting Plaintiff's height, weight, and BMI of 38, and citing the relevant SSR 02-1p, she stated that she had "considered the impact obesity has on the limitation of function and finds that symptoms of the claimant's orthopedic impairments are aggravated by her obesity." (Tr. 163). Several pages later, the ALJ returned to the same issue, noting that obesity "may be disabling in and of itself and may dramatically worsen other medical conditions." (Tr. 166). After more extensively setting forth the criteria to be considered in SSR 02-1p, the ALJ explained that "[t]he record …does not document a finding that the claimant was unable to ambulate effectively at any material time due to her obesity. Nevertheless, considerations have been taken into account in

---

[9]The undersigned notes that Plaintiff's 35-page Statement of Errors is replete with arguments that lack any specific page citations to the medical record. While the undersigned has reviewed the 1352 page administrative record at length, this Court has no duty to scour the record to find appropriate citations.

reaching the conclusions herein at the second through fifth steps of the sequential disability evaluation process." (*Id.*).

When an ALJ's decision as a whole articulates the basis for her conclusion, the decision may be affirmed. Despite some ambiguity,[10] the ALJ's discussion of Plaintiff's obesity was adequate on the record presented here. *See generally Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. 2006)(stating that "[i]t is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants."); s*ee also Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985); *Moody v. Com'r of Soc. Sec.,* 2011 WL 3840217 at *9 (E.D. Mich. July 15, 2011)(affirming where medical evidence reflected obesity, and ALJ found that Plaintiff could not engage in *any* climbing, crawling, bending, kneeling, stooping or crouching, could stand for no more than 10 minutes at a time, and required a sit/stand option, all of which addressed mobility problems associated with obesity). *Price v. Heckler*, 767 F.2d 281, 284 (6th Cir. 1985); *Cranfield v. Com'r of Soc. Sec.*, 79 Fed. Appx. 852, 857 (6th Cir. 2003)(affirming in case where the claimant failed to present evidence of any specific obesity-related limitations, such that "the ALJ was not required to give the issue any more attention than he did.").

### 4. Failure to Obtain Additional Medical Evidence

In its remand order, the Appeals Council directed the ALJ to:

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed

---

[10]For example, the ALJ's statement that the record does not document that claimant "was unable to ambulate effectively …due to her obesity" is technically true, although the record reflects that Plaintiff used a cane at times due to pain complaints and osteoarthritis in her knees.

> limitations….As appropriate, the Administrative Law Judge may request the treating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments.

(Tr. 378). Plaintiff vigorously argues that the ALJ improperly disregarded the directive, and should have obtained additional medical evidence from treating sources. (Doc. 12 at 19, 26, 27-28).

Defendant counters that "the remand order merely reminded the ALJ of the option to contact treating sources" and cannot be considered a mandate. Defendant argues that it was not "appropriate" to re-contact any sources in this instance because "none of them even hinted that they conducted the requisite detailed clinical testing necessarily [sic] to exclude other explanations for Plaintiff's complaints." (Doc. 12 at 5). While the undersigned agrees that the language of the Appeals Council was permissive and not mandatory, the Defendant overstates the record concerning the "clinical testing" that was performed. The records of Drs. Ware and Jarrett both reflect "trigger point" testing prior the diagnosis of fibromyalgia, and multiple other treating physicians confirmed that diagnosis. Even though records of other treating sources do not reflect trigger point testing, the multiple sources who consistently included the same diagnosis are presumed to have based it on Plaintiff's symptoms over the years and the fact that none of Plaintiff's myriad other diagnoses could fully account for the ongoing complexity and severity of her complaints. To the extent that the ALJ disbelieved her diagnosis of fibromyalgia despite the consistent records from multiple medical sources over a period of nearly 25 years, the ALJ should have re-contacted treating sources for clarification.

Alternatively, Defendant argues that clarification from treating sources was unnecessary because the ALJ adequately discussed why Plaintiff's subjective

complaints of pain from her alleged fibromyalgia (and other ailments) were properly discredited.    (Doc. 12 at 5).    For the reasons previously stated, however, the undersigned disagrees that Plaintiff's subjective complaints were properly discredited.

Plaintiff more specifically argues that the ALJ should have contacted treating sources regarding her use of a cane, rather than rejecting Plaintiff's need for a cane based solely on a single notation by an unidentified home health care worker on December 2, 2010 that Plaintiff moved "easily with no use of any assistive devices" on that particular day. (Tr. 1304). While Plaintiff cites generally to exhibit "15F" and to "Tr. 934," in support of the asserted prescription for a cane, Tr. 934 is merely the MRI record of an image of Plaintiff's knee, not a prescription for a cane, and the undersigned was unable to locate any specific prescription for a cane among the 45 pages of Exhibit 15F.[11]  On the other hand, many of Plaintiff's medical records on other dates do make reference to Plaintiff's use of a cane.  Even notes from the same home health care agency reflect that Plaintiff "requires assistance with personal care of getting in and out of shower, skin care, assistance with housekeeping due to decreased endurance and fatigue level," and that Plaintiff generally requires some "as needed" assistance with ambulation. (Tr. 1291-1292).  Plaintiff herself testified that she "may not" use her cane every day, "especially if I'm at home," but that it was prescribed by "Dr. Hurr."  (Tr. 190-192).  While any question regarding whether a cane was actually prescribed to Plaintiff, standing alone, would not require remand, the ambiguity could have been clarified by any treating source.

---

[11]Despite failing to provide an accurate citation, Plaintiff insists that a cane was prescribed on October 15, 2008.  (Doc. 9 at 13).

### 5. Failure to Properly Evaluate RFC as directed by Appeals Council

Last, Plaintiff asserts that the ALJ failed to properly evaluate her residual functional capacity as directed by the Appeals Council. The ALJ found that Plaintiff retained the RFC to perform a limited range of sedentary work, including standing up to two hours and sitting up to six hours per day. *See* 20 C.F.R. 404.1567(b); SSR 83-10. Plaintiff contends that the ALJ's RFC failed to adequately consider her chronic pain and fatigue and other subjective complaints, and that the RFC was based upon improper weighing of the medical opinion evidence.[12] Plaintiff's subjective complaints have previously been discussed, but the undersigned agrees that the ALJ also improperly weighed some of the medical opinions, and misrepresented Plaintiff's RFC when assessing her ability to perform her past relevant work.

The RFC specified by the ALJ drew heavily from the function-by-function analysis performed by consulting reviewing physicians in connection with Plaintiff's second application for DIB. In fact, the ALJ placed "significant weight" on that opinion evidence. In a critical difference, however, the ALJ disregarded without any discussion a key portion of that same opinion evidence: the agency consultants' determination that Plaintiff would be unable to perform her past relevant work on a sustained basis. The consulting psychologist, Dr. Vicki Warren, explained: "While her PRW consisted of sed[entary] work, one of them had heavier lifting than what her RFC limits her to and *all of them are beyond her stress tolerance level.*" (Tr. 356, 372, emphasis added). Thus, the agency physicians initially determined on reconsideration that Plaintiff was disabled

---

[12]Although the error is listed as a challenge to the RFC, Plaintiff's somewhat rambling argument spans broader issues, including the ALJ's assessment of medical opinion evidence and her conclusion that the stated RFC would allow for past relevant work.

under Grid Rule 201.06, because she fell within the "advanced age" category and could not perform her prior skilled or semi-skilled work due to a combination of mental and physical impairments, with particular focus on her mental limitations in <u>sustained</u> concentration and persistence, and stress tolerance.  (Tr. 354).  Esberdado Villanueva, M.D. reached the same conclusion, (*see* Tr. 356, 372), and the ALJ also gave his opinion "significant weight."  (Tr. 173).

Further, the ALJ gave "great weight" to the similar January 2011 opinion of examining psychologist Dr. Ward.  Dr. Ward opined that Plaintiff's ability to withstand day-to-day work stress is "moderately impaired," and that such stress "would exacerbate her mental health problems, leading to an increase in anxiety and emotional instability."  Dr. Ward further opined that Plaintiff's ability to relate to fellow workers and supervisors is "mildly impaired" by her mental health difficulties, and that "critical feedback …would lead to emotional decompensation."  (Tr. 1254).

In an attempt to rationalize the glaring discrepancy between the ALJ's heavy reliance on the opinion evidence from these agency consultants, and her rejection of the "disability" portion of their opinions, Defendant argues that "[t]he ALJ reasonably credited a vocational expert's evaluation of the requirements of specific jobs…over those of medical doctors."  (Doc. 12 at 12).  However, the ALJ's written opinion is completely silent on that issue.  In other words, the opinion evidences no deliberate indication that the ALJ actually intended to credit the VE's testimony over the opinions offered by agency consultants on whom she placed "great weight."  In addition, a close reading of the record suggests that the ALJ failed to incorporate key aspects of the Plaintiff's mental RFC into the hypothetical posed to the VE, rendering the VE's

testimony insufficient to constitute substantial evidence that Plaintiff could perform her past work.

At the 2012 hearing, the ALJ first paraphrased the function-by-function analysis of the agency consultants in formulating a hypothetical for the VE as follows:

> From a mental standpoint let's just say that there's no significant limitation in the ability to carry out short and simple instructions or detailed instructions maintain attention and concentration for extended periods; not significantly limited; perform activities within a schedule not limited. Can deal with supervisory routine.

> To deal with the work day without interruptions is moderately limited to the point that the limitations mentally, her stress tolerance is limited. She can adapt to work settings in which duties are routine and predictable.

(Tr. 280). In response, the VE testified that Plaintiff could have continued to work either as an accounts assistant or an accounts payable clerk. (*Id.*).

When the ALJ altered the hypothetical to include more specific "moderate" impairments as opined by Dr. Ward (which the ALJ ostensibly adopted), the VE testified that Plaintiff could still work as an accounts payable clerk, but that she would not be able to work as an accounts assistant because it would be too stressful. (Tr. 281). That actual testimony contrasts with the ALJ's erroneous description of the VE's testimony. In the ALJ's written opinion, she states that, when provided with the limitations found by the agency consultants, the VE testified that Plaintiff could perform "past relevant work as an account assistant <u>and</u> accounts payable clerk <u>as both generally and actually performed</u>." (Tr. 174, emphasis added).

Finally, it is noteworthy that the ALJ failed to include in any hypothetical the consultants' view that Plaintiff had "moderate" limitations to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 354). The closest the ALJ came to including that limitation was suggesting that Plaintiff had a "poor ability to tolerate work stresses, meet - - [a]n ability to behave predictably because of pain or mental symptoms, demonstrate reliability due to physical and mental problems, concentrate, complete a normal work day." In response to that third hypothetical, the VE opined that Plaintiff would be unable to "sustain herself in [any] employment." (Tr. 282). In other words, if the ALJ had given any additional credit to Plaintiff's subjective complaints, including her testimony and record of frequent absenteeism,[13] or if the ALJ had placed more emphasis on Plaintiff's difficulty to behave predictably (i.e., the "emotional decompensation" with criticism found by Dr. Ward), or more fully described the type of work stress limitation found by the agency consultants (which could result in frequent absenteeism), then the VE's testimony would have resulted in a finding of disability.

In sum, the ALJ seemingly adopted the agency consultants' RFC opinions, but then rejected their opinions that the stated RFC precluded past relevant work, without any acknowledgement of the fact that she was doing so. While the ALJ ostensibly relied upon new VE testimony that was allegedly at variance with the agency consultants' opinions, the ALJ arguably did not include all relevant mental limitations in the hypothetical posed to the VE, and misrepresented the VE's actual testimony in response to the limitations that she did include. For those reasons, the undersigned

---

[13]The VE testified that Plaintiff could "because these are jobs where she would not get close supervision may be able to miss up to two days." (Tr. 282, emphasis added). However, the VE clarified that if Plaintiff missed two days consistently, she would be unable to maintain employment and "be gone in five months." (Tr. 283).

concludes that the VE's testimony does not constitute substantial evidence sufficient to uphold the non-disability determination in this case.

Although the undersigned has found error with the ALJ's analysis of the medical source opinions on which she relied, it is worth noting that I find no similar error in the ALJ's rejection of Dr. Jarrett's extremely brief December 2007 opinion that Plaintiff "is disabled due to Fibromyalgia and Back Problems." (Tr. 935). Although the ALJ's rejection of the fibromyalgia diagnosis itself was erroneous, the rejection of such a conclusory "disability" opinion can be affirmed because Dr. Jarrett failed to include any explanation or support for the basis for his opinion (other than citing two diagnoses which are often not disabling). The relevant regulation requires deference to be given to treating physicians only for opinions that are "well-supported…." 20 C.F.R. §404.1527(c)(2).

### III. Conclusion and Recommendation

For the reasons discussed above, and reviewing the record as a whole, the undersigned recommends reversal and remand for an award of DIB, either based on a presumed disability onset date of August 1, 2009, or alternatively, on a date to be determined on remand, but not later than August 4, 2010. *See generally Faucher v. Secretary of Health and Human Servs.,* 17 F.3d 171, 174 (6th Cir. 1994).

Accordingly, **IT IS RECOMMENDED THAT**:

1. The decision of the Commissioner to deny Plaintiff DIB benefits should be **REVERSED** and this matter should be **REMANDED** for calculation of an award of benefits under sentence four of 42 U.S.C. §405(g);

2. As no further matters remain pending, this case should be **CLOSED.**

27

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHERYL C. SHIVELY,                                    Case No. 1:13-cv-788

                  Plaintiff,                              Spiegel, J.
    v.                                                    Bowman, M.J.


COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

29